[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11469

_____

D.C. Docket No. 1:18-cv-05963-JPB

OQUESHIA ANDREWS,

Plaintiff-Appellant,

versus

CARMEL BIGGERS, JR.,
in his individual and official capacity,
TIM POUNDS,
in his official capacity as Douglas County Sheriff,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 7, 2021)

Before WILSON, ROSENBAUM, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Oqueshia Andrews alleges that Douglas County Sheriff's Deputy Carmel

Biggers fondled her, kissed her, and watched her shower, all without her consent, when she was an inmate in the county jail. According to Andrews, the reason Biggers, who is male, could do those things is that Douglas County Sheriff Tim Pounds operates the jail with a policy that allows "cross-gender supervision of inmates without reasonable safeguards in place." Andrews sued Pounds in his official capacity under 42 U.S.C. § 1983, and the district court granted Pounds' motion to dismiss, concluding that under Purcell ex rel. Estate of Morgan v. Toombs County, 400 F.3d 1313 (11th Cir. 2005), Pounds was due Eleventh Amendment immunity because he acts as an arm of the State "when promulgating policies and procedures governing conditions of confinement" at the county jail. Id. at 1325.

Andrews concedes, as she must, that Purcell "control[s] the outcome of this case because both cases relate to the function of jail operations" and that the district court was "bound by precedent" to follow it. Since Georgia law as it relates to sheriffs' duties and control has not meaningfully changed since we issued Purcell, we agree. But Andrews wants Purcell overruled and our Court "to revisit the factors discussed" in Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003) (en banc), the decision on which Purcell relies and which she recognizes "runs contrary to her position." She believes Manders "misapplies" to Georgia sheriffs the Supreme Court's analysis in McMillian v. Monroe County, 520 U.S. 781 (1997). Of course,

2

we as a panel cannot overrule Manders or Purcell.  "Under our prior precedent rule, a panel cannot overrule a prior one's holding even [if] convinced it is wrong." United States v. Steele, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (en banc).  We have "categorically reject[ed] any exception" to that rule "based upon a perceived defect in the prior panel's reasoning or analysis as it relates to the law in existence at that time."  Smith v. GTE Corp., 236 F.3d 1292, 1303 (11th Cir. 2001).  Those principles apply as strongly, if not more so, where the earlier precedent is an en banc decision.

The district court correctly held that Pounds was due Eleventh Amendment immunity under Purcell.  See 400 F.3d at 1325.

**AFFIRMED.**

3

WILSON, Circuit Judge, concurring:

I concur in today's decision because *Purcell ex rel. Estate of Morgan v. Toombs County*, 400 F.3d 1313 (11th Cir. 2005), is binding precedent that controls the outcome of this case. I write separately, however, to express my view that *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc)—which *Purcell* relies on—was incorrectly decided. Judge Anderson and Judge Barkett wrote compelling dissents in *Manders*, both of which I joined. I continue to agree with their criticism of the *Manders* majority. Nonetheless, under our prior-precedent rule, we are bound to follow *Manders* and its progeny unless it "is overruled en banc or by the Supreme Court." *United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993). For this reason alone, I concur.

ROSENBAUM, Circuit Judge, concurring:

I concur in the panel's decision to affirm the district court's decision to dismiss Andrews's claim against Sheriff Pounds because he is entitled to sovereign immunity under binding case law. *See Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc); *Purcell ex rel. Estate of Morgan v. Toombs Cnty.*, 400 F.3d 1313 (11th Cir. 2005). I write separately to explain why this Court should reevaluate this case law en banc, and in particular, our decision in *Purcell*.

Under the concept of Eleventh Amendment *state* sovereign immunity, our decisions in *Manders* and *Purcell* effectively insulate *local* governments in Georgia from liability in federal court when county sheriffs violate citizens' constitutional rights. For example, here, Douglas County is protected from liability even though, assuming the truth of Andrews's allegations, a Douglas County deputy sheriff engaged in a pattern and practice of sexually harassing and assaulting women incarcerated in Douglas County Jail. These are horrific and disturbing allegations, but under our precedent, the victims have no recourse against what is, in reality, the local government entity overseeing the county jail.

Our case law rests on misinterpretations of Georgia law and the Supreme Court's state sovereign-immunity precedent. My disagreement with this line of cases is not unusual; the sheer number and length of the dissents in these cases attest to that fact. *See Manders*, 338 F.3d at 1329 (Anderson, J., joined by Tjoflat, Birch, and

5

Wilson, JJ., dissenting); *id*. at 1332 (Barkett, J., joined by Tjoflat, Birch and Wilson, JJ., and joined in part by Anderson, J., dissenting); *Lake v. Skelton*, 840 F.3d 1334, 1345 (11th Cir. 2016) (Parker, J., dissenting) ("*Lake I*"); *Lake v. Skelton*, 871 F.3d 1340, 1344 (11th Cir. 2017) (Martin, J., dissenting from denial of rehearing en banc) ("*Lake II*"). Today, I join this chorus of voices raising concerns about our sovereign-immunity doctrine with respect to Georgia sheriffs.

In this concurrence, I seek to reiterate some of my colleagues' fundamental concerns with our reasoning in *Manders* and *Purcell*. I also explain why our decision in *Purcell* conflicts with *Manders* and should be abrogated regardless of whether we reconsider the ultimate holding in *Manders*.

## I.

To determine whether an official or entity is an "arm of the State," we look to four factors: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders*, 338 F.3d at 1309. In *Manders*, we found that, on balance, the factors weighed in favor of granting immunity to sheriffs when they set their "use-of-force policy at the [county] jail[.]"

6

*Id*. at 1328.  But a clear reading of Georgia law demonstrates that all four factors weigh against a finding of immunity.[1]

**A.**

First, I consider how state law defines the entity.  The Georgia Constitution could not be any more explicit:  sheriffs are "county officers" who are elected by the voters of their respective counties.  Ga. Const. art. IX, § 1, ¶ 3.  Under the Georgia Constitution, sheriffs are considered part of "Counties and Municipal Corporations," *id*. art. IX, not the state's executive branch, *id*. art. V (addressing the "Executive Branch").  And as for the particular function at issue in this case—the cross-gender supervision of detainees at county jails—Georgia statutory law explicitly defines sheriffs as "jailers of the counties."  O.C.G.A. § 42-4-1(a).

Georgia courts also have consistently held that "a lawsuit against a sheriff in his official capacity is considered a suit against the county[.]"  *Davis v. Morrison*, 810 S.E.2d 649, 651 (Ga. Ct. App. 2018) (citation and internal quotation marks omitted); *see also Gilbert v. Richardson*, 452 S.E.2d 476, 478 n.4 (Ga. 1994).  And since our decision in *Manders*, Georgia courts have reiterated that "[s]heriffs clearly perform governmental services *on a local level*[.]"  *See Channell v. Houston*, 699 S.E.2d 308, 310 (Ga. 2010) (emphasis added).

---

[1] My analysis will focus on our reasoning in *Manders* since *Purcell* did not discuss the four factors and simply relied on our holding in *Manders*.  *See Purcell*, 400 F.3d at 1325.

Normally, under our precedent, when a state's constitution and case law define an official as a county officer, that "weighs against arm of the state status." *Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 405 F.3d 1298, 1305-6 (11th Cir. 2005); *cf. McMillian v. Monroe Cnty.*, 520 U.S. 781, 787 (1997) (relying on the "the constitutional provisions concerning sheriffs, the historical development of those provisions, and the interpretation given them by the Alabama Supreme Court" to determine whether Alabama sheriffs represent the State for purposes of liability under 42 U.S.C. § 1983).

But in *Manders*, we did not follow that practice. Instead, we dismissed the language in Georgia's constitution as mere "nomenclature" that "reflect[ed] a geographic label defining the territory in which a sheriff is elected and mainly operates." *Manders*, 338 F.3d at 1312. Declining to take the Georgia Constitution at its word, we found that sheriffs are "arms of the state" because they "perform specific statutory duties, directly assigned by the State, . . . in corrections." *Id.* at 1319. We concluded that counties lack control over the sheriff's office under the Georgia Constitution to the point that the sheriff's office is "a separate and independent office" from the county and its governing body. *Id.*

Our reading of Georgia law and this Court's sovereign-immunity case law was flawed. As an initial matter, *Manders* conflates the first two factors by using state control (and the lack of county control) over sheriffs to define sheriffs and the

function at issue. But the "two factors should not be collapsed." *Lake I*, 840 F.3d at 1347-48 (Parker, J., dissenting).

Second, *Manders* focuses far too much on the county's lack of control over sheriffs. *Manders*, 338 F.3d at 1310; *id.* (noting that Georgia Constitution gives counties no "legislative power or authority over sheriffs and expressly prevents counties from controlling or affecting the sheriff's office or the personnel thereof."); *id.* (stressing that sheriffs are "*not* county employees") (citing *Bd. of Comm'rs of Randolph Cnty. v. Wilson*, 396 S.E.2d 903 (Ga. 1990)); *id.* at 1319 (explaining that "the sheriff's office is a separate and independent office from both [the] County and its governing body").

By training its analysis on the county's control, *Manders* "asks the wrong question." *Id.* at 1331 (Anderson, J., dissenting). The purpose of the Eleventh Amendment "arm of the state" inquiry is not to assess "who has the most control, the state or the county." *Id.* Rather, the inquiry seeks to evaluate whether the *State* has enough control over an official for the official to be considered an "arm of the state." *Id.*; *see also Lake II*, 871 F.3d at 1354 ("The Eleventh Amendment inquiry is about whether the state controls the sheriff and is financially responsible for his actions") (Martin, J., dissenting from denial of rehearing en banc).

*Manders* is surely correct that sheriffs are not controlled by the county commission and are not "employee[s] of the county commission." *Wilson*, 396

S.E.2d at 903.  But that does not mean the State defines sheriffs as State entities.  *See*

*Manders*, 338 F.3d at 1331-32 (Anderson, J., dissenting).

*Manders*'s emphasis on the sheriff's independence from county governing bodies also misunderstands the nature of county government in Georgia.  As Judge Barkett explained, "[T]he county commission is not the only institution that acts for the county."  *Id*. at 1343 n.15 (Barkett, J., dissenting).  Georgia has structured its county governments in a way that spreads power between co-equal, but separate, offices "akin to the federal government's separation of powers."  *Id*.  "Thus, the sheriff's independence from the county commission should be interpreted not as independence *from the county,* but rather as *independent authority to act for the county* with respect to the functions entrusted [to] his office."  *Id*.   Indeed, Georgia courts have since explained that the sheriff "is an elected *constitutional county officer* and not a county employee."  *Freeman v. Brandau*, 664 S.E.2d 299, 301 (Ga. Ct. App. 2008) (emphasis added).

Third, *Manders* places too much emphasis on the fact that the sheriff's duties and powers are defined by state law.  In fact, the State Legislature's power to define the duties of the sheriff's office "indicates nothing more than its role as the seat of legislative power in Georgia."  *Manders*, 338 F.3d at 1338 (Barkett, J., dissenting). All local government entities, including county commissioners, are subject to the "state's sovereign prerogative to structure local government."  *Id*. at 1338; *see also*

*Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994) (explaining that "political subdivisions exist solely at the whim and behest of their state") (cleaned up). As a result, the State Legislature's authority to define the duties and powers of the sheriff's office in Georgia is not a particularly strong indicator of state control.

At bottom, the plain language of Georgia constitutional and case law makes clear that sheriffs are county officials. Under a proper reading of Georgia law, then, this factor weighs against immunity.

**B.**

The second factor requires us to consider what degree of control the State maintains over the entity or official. In *Manders*, we concluded that the State maintains control over sheriffs through its ability to "mandate[] and control[] sheriffs' specific duties," and its responsibility to train and discipline sheriffs. *Manders*, 338 F.3d at 1320. But this conclusion suffers from many of the same flaws as the analysis under the first factor.

For example, *Manders* again reads too much into the state's residual legislative control over sheriffs. Indeed, "ultimate control of every state-created entity resides with the State[.]" *Hess*, 514 U.S. at 47. Georgia is no different. No doubt, the State Legislature has the authority to define the powers and duties of sheriffs in Georgia. Ga. Const. art. IX, § 1, ¶ 3(a)-(b). But that does not distinguish sheriffs from any other local government entity: the constitution also gives the State Legislature the

11

authority to define the powers and duties of other local officials—including county commissioners. *Manders*, 338 F.3d at 1338 (Barkett, J., dissenting) (citing Ga. Const. art. IX, § 2, ¶¶ 1(a), (c)(1)).

The State also ultimately maintains training and disciplinary control over other local officials. For example, the State Legislature has used this power to require county commissioners, like sheriffs, to meet certain training requirements. *Id*. at 1343 (citing O.C.G.A. § 36-20-4 (requiring county commissioners to complete 18 hours of training on "matters pertaining to the administration and operations of county governments")).

*Manders* also (and again) harps on the lack of control counties maintain over sheriffs as evidence of state control. *Manders*, 338 F.3d at 1322. But as I explained above, county control, or the lack of it, does not show state control. And Georgia law specifically designed the sheriff's office to maintain some independence from county governing bodies.

More importantly, *Manders* ignores the portions of Georgia law that *do* give counties control over county sheriffs and their operation of county jails. For an inmate in a county jail, counties have a duty under Georgia law to "maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention." O.C.G.A. § 42-5-2(a). Counties also must defend any habeas corpus or other proceeding initiated by an inmate of a county jail and must "bear all expenses

12

relative to any escape and recapture" of inmates. *Id*. Plus, the county commission is in charge of "directing and controlling all of the property of the county"—including county jails. *Id*. § 36-5-22.1(a)(1).

Georgia law likewise clearly differentiates between responsibility for control over state correctional facilities on the one hand and county jails on the other. State correctional facilities are under the control of the Department of Corrections, a state government entity. *Id*. §§ 42-2-5, 42-5-53(b). But the Department has "no authority, jurisdiction, or responsibility" over those offenders who are sentenced to confinement in a county jail. *Id*. § 42-5-51(a). Instead, the "county wherein the sentence is imposed *shall have the sole responsibility* of executing the sentence and of providing for the care, maintenance, and upkeep of the inmate while serving such sentence[.]" *Id*. (emphasis added).

Not only that, but state law grants counties the power to conduct grand-jury investigations into the conditions of their own county jails. O.C.G.A. § 15-12-71(b)(1), (c). *Manders* attempts to distinguish this provision by observing that grand juries "perform discrete functions in the State's justice system," including investigating all county buildings and governing bodies. *Manders*, 338 F.3d at 1322 n.40. But even so, state law requires grand juries conducting inspections under O.C.G.A. § 15-12-71 to make recommendations and presentments to county governing authorities on the sanitary conditions of the jails and "the treatment of the

13

inmates as the facts may justify." *See* O.C.G.A. § 15-12-78; *see also Manders*, 338 F.3d at 1341 n.13 (Barkett, J., dissenting). It is telling that this statute requires a grand jury to inform county commissions about investigations of county jails.

A balanced reading of Georgia law reveals that counties retain significant control over county sheriffs. By contrast, the State merely has the residual power it retains over every local governmental entity. For these reasons, *Manders* erred in concluding that the control factor favors a finding of immunity.

### C.

The third factor requires us to account for where the entity or official derives funds. No one disputes that Georgia law requires counties to fund county jails. *See* O.C.G.A. §§ 36-9-5(a), 42-5-2(a); *see also Manders*, 338 F.3d at 1323; *Lake I*, 840 F.3d at 1343-44. The county commission has "the power and the duty to issue a budget" for the sheriff. *Chaffin v. Calhoun*, 415 S.E.2d 906, 907 (Ga. 1992). This includes the authority to "amend or change estimates of required expenditures" presented by the sheriff. *Bd. of Comm'rs of Dougherty Cnty. v. Saba*, 598 S.E.2d 437, 439 (Ga. 2004).

Despite the commission's authority over the sheriff's budget, *Manders* concluded that the county's "financial control" was "attenuated" because the State requires the county to fund the sheriff's budget, and the county cannot dictate how the sheriff spends it. 338 F.3d at 1323. True, the county commission cannot "dictate

14

to the sheriff how [his] budget will be spent in the exercise of his duties." *Chaffin*, 415 S.E.2d at 907. Nor can the commission remove "*all* funds" from the sheriff's budget or "divest the sheriff of his law enforcement power and duty." *Id.* at 908.

But the county commission still enjoys the "authority to make very substantial cuts in sheriffs' funding." *Manders*, 338 F.3d at 1345 (Barkett, J., dissenting) (collecting cases). And a county commission's changes to the sheriff's budget may be reviewed by courts for abuse of discretion only. *Saba*, 598 S.E.2d at 439. To survive judicial review, the budget need be only "reasonable under all the circumstances and . . . provide reasonably sufficient funds to allow the sheriff to discharge his legal duties." *Chaffin*, 415 S.E.2d at 908. Under this lenient standard of review, Georgia courts have upheld significant budget cuts—even cuts that force sheriffs to lay off staff and deputies. *See, e.g., id.* at 908. In short, a county commission can "act autonomously in funding the sheriff[] so long as [its] appropriations preserve the sheriff's capacity to execute the basic functions of office." *Manders*, 338 F.3d at 1345 (Barkett, J., dissenting).

But even if we assume that the *Manders* reading of Georgia law—that counties lack "financial control" over sheriffs—is correct, that conclusion still fails to prove that sheriffs are "arms of the state." For one, *Manders*'s concern with "financial control" inappropriately collapses the control factor into the funding part of the analysis. The funding factor is about determining where the official "derives its

15

funds," *Manders*, 338 F.3d at 1309, not determining which governmental unit controls the sheriff's use of its funds. And under Georgia law, the answer to the proper inquiry is straightforward: sheriffs derive their funds from the county.

More importantly, *Manders* (yet again) focuses on the wrong issue—the absence of county control as opposed to the presence of state control. Any lack of county control here does not by default indicate state control. Given the structure of county government in Georgia, it makes complete sense that checks exist on the county commission's power to shape the sheriff's budget. As I explained earlier, sheriffs are county officers, but by design, they work independently from county governing bodies. *See Saba*, 598 S.E.2d at 439 (reiterating that the sheriff "is an elected constitutional *county* officer and not an employee of the county commission") (emphasis added). Sheriffs would lose their constitutionally guaranteed independence if county commissions could dictate how they spend their budget.

For these reasons, *Manders* erred in concluding that the third factor also tilted toward immunity.

## D.

Finally, we must consider who is financially responsible for a judgment against the sheriff. Everybody agrees that this factor weighs against immunity for sheriffs because no law in Georgia requires the State to foot the bill for adverse judgments against sheriffs. *See Manders*, 338 F.3d at 1327; *Lake I*, 840 F.3d at 1344. And yet

16

in *Manders* we concluded that this fact "does not defeat immunity." *Manders*, 338 F.3d at 1329.

This conclusion is at odds with the Supreme Court's and our precedent on Eleventh Amendment immunity. The Supreme Court has explained that "the vulnerability of the State's purse [i]s the *most salient* factor in Eleventh Amendment determinations." *Hess*, 513 U.S. at 48 (emphasis added). Indeed, the "prevention of federal-court judgments that must be paid out of a State's treasury" is the "impetus for the Eleventh Amendment." *Id*. We have reiterated that principle in our post-*Manders* cases. For example, we concluded that the fact that the State of Florida did not have to pay adverse judgments against county sheriffs was "in itself, a clear marker that the Sheriff is not an arm of the state." *Abusaid*, 405 F.3d at 1313.[2]

*Manders*, however, determines that "an actual drain on the state treasury" is not necessary to find Eleventh Amendment immunity. *Manders*, 338 F.3d at 1327. True, a drain on the State treasury may not be dipositive, but neither is control—the only factor *Manders* seemed to care about. *Manders* purports to analyze all four Eleventh Amendment factors, but in reality, it collapses the first three factors into one—control. Yet the Supreme Court in *Hess* was clear that control is not

---

[2] In *Manders*, we determined that a sheriff would have to pay adverse judgments against him out of his own budget. *Manders*, 338 F.3d at 1327. We concluded that system would implicate both county and state funds because the sheriff would have to "recoup that money from somewhere." *Id*. But in *Abusaid*, we held that indirect impacts on a state's treasury are not enough to implicate Eleventh Amendment interests. 405 F.3d at 1312.

17

"dispositive" because it fails to account for the core purpose of the Eleventh Amendment—protecting the State's treasury. *Hess*, 513 U.S. at 48. The Court also pointed out that control is a weak indicator of immunity because "ultimate control" of every local-government entity resides with the State. *Id*. at 47. Control, then, if taken to its logical conclusion, would make every local-government entity an "arm of the state"—a conclusion that cannot be right. So in *Manders*, we should have put more emphasis on this final factor and less on control.

## II.

Even if we ultimately decline to rethink our reasoning and holding in *Manders*, we should still review our holding in *Purcell*—the case the district court relied on here—because *Purcell* is itself inconsistent with our holding in *Manders*.

*Manders* holds that the "arm of the state" analysis must "focus on the nature of the particular function at issue" in the case. 338 F.3d at 1319. And *Manders* is clear that the particular function should not be framed "too broad[ly]." *Id*. at 1309 n.9. For example, in *Manders*, Clinch County's Sheriff was accused of permitting his deputies to use excessive force at the county jail. Instead of framing the function at issue broadly, *Manders* homes in on the precise function at issue: the sheriff's "force policy at the jail and the training and disciplining of his deputies in that regard." *Id*. at 1308-9. We emphasized that courts should not define particular

functions "in some categorical all or nothing manner in connection with the county jail." *Id*. at 1309 n.9

But where *Manders* takes a scalpel, *Purcell* uses a meat axe. Instead of tailoring the analysis to the precise function at issue—the prevention of inmate-on-inmate violence—*Purcell* broadly declares that sheriffs function as an "arm of the state" "when promulgating policies and procedures governing the conditions of confinement" at county jails. *Purcell*, 400 F.3d at 1325. That "categorical all or nothing" definition of the function at issue directly contradicts our prior holding in *Manders*.

To make matters worse, *Purcell*'s broad definition of the function at issue drastically expands the scope of our limited holding in *Manders*—that sheriffs are an "arm of the state" when they establish use-of-force policy at county jails. *Manders*, 338 F.3d at 1328. But *Purcell* reads *Manders*'s holding to mean that sheriffs are always an "arm of the state" when they create and enforce "policies and procedures governing the conditions of confinement" at county jails. *Purcell*, 400 F.3d at 1325.

This expansion of *Manders*'s holding forecloses any case against a Georgia sheriff regarding the operation of county jails, even though *Manders* explicitly rejects that categorical approach. To stay true to our holding in *Manders*, then, at the very least, we should reconsider *Purcell*'s holding that sheriffs act as an "arm of the state" for any function related to the county jail. Rather, we should drill down on the

19

specific function at issue in each case and determine, based on the four *Manders* factors, whether the sheriff is acting as an "arm of the state" for that particular function.

## III.

It is time for us to reevaluate our decision in *Manders*. Our holding in that case rests on a misinterpretation of Georgia law and our Eleventh Amendment immunity precedent. And even if we do not revisit *Manders*, we should reconsider our overly broad holding in *Purcell* that sheriffs are immune from all suits "when promulgating policies and procedures governing conditions of confinement" at the county jail. *Purcell*, 400 F.3d at 1325. That holding—a drastic expansion of our holding in *Manders*—precludes on the basis of *state* immunity all those incarcerated in Georgia *county* jails from vindicating their rights in federal courts. Our decision in this case only further proves that fact. I respectfully urge the Court to reconsider these cases.

20