[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 24, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-14995

_____

D. C. Docket No. 05-00127-CV-JTC-3

RANDAL J. CHATHAM,

Plaintiff-Appellant,

versus

COLONEL BLAKE ADCOCK,
Administrator of the Coweta County
Jail, is sued in his official and
individual capacity,
SGT. ELIZABETH HOMER,
on duty officer in charge at Coweta County
Jail, is sued in her official and
individual capacity,
JENNIE ADCOCK,
head nurse at the Coweta County Jail, is
sued in her official and individual capacity,

Defendants-Appellees,

SGT. JOHN LEWIS,
detective, is sued in his official
and individual capacity,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(June 24, 2009)

Before TJOFLAT and CARNES, Circuit Judges, and HOOD,[*] District Judge.

PER CURIAM:

Randal Chatham, a pro se prisoner, filed a complaint against three prison officials of the Coweta County Jail complaining that the officials showed deliberate indifference to a serious medical condition by denying him access to medication and failing to protect him from prisoner violence, in violation of the Eighth and Fourteenth Amendments. See U.S. Const. , amend. VIII, XIV. The prison officials denied Chatham's allegations and, as an affirmative defense, alleged that they were immune from suit under the doctrine of qualified immunity. Following an initial round of discovery, the officials moved the district court for summary judgment, asserting their defense of qualified immunity. Addressing the question of whether the evidence of record showed that the officials had infringed

_____

[*] Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Chatham's constitutional rights as alleged, the district court held that it did not; the evidence was insufficient to make out a case for the jury. The court therefore granted summary judgment.

Chatham now appeals the court's ruling.[1] The thrust of his appeal is that the district court erred in concluding that the evidence was insufficient to establish triable issues of fact on his claims that the officials were deliberately indifferent to his serious medical needs and in failing to protect him from inmate violence. We agree that the evidence was insufficient to establish these claims for the reasons stated in the portion of the district court's order granting summary judgment attached to this opinion as an Appendix. See Chatham v. Adcock, No. 3:05-CV-0127, Order and Opinion (2007).

AFFIRMED.

---

[1] In his appeal, Chatham also challenges the district court's denial of (1) his request for the appointment of counsel, (2) his motion for a continuance, (3) his motion to compel discovery, (4) his motion for reconsideration of the court's order denying his motion to amend his complaint and to dismiss the officials' summary judgment motion, and (5) his motion for leave to amend his complaint. We find no merit in any of these challenges. Rulings (1), (2), (3), and (5) were proper exercises of the district court's sound discretion and we find no error in ruling (4).

APPENDIX

\* \* \* \*

**B.    Lack of physical injury due to denial of Xanax**

**1.    The legal framework**

As discussed in greater detail in Section IV.D.1., *infra*, the Eighth Amendment prohibits cruel and unusual punishment, including deliberate indifference to a serious medical need amounting to the unnecessary and wanton infliction of pain. See Steele v. Shah, 87 F.3d 1266, 1269 (11th Cir. 1996) (stating that "[i]n this circuit, it is established that psychiatric needs can constitute serious medical needs and that the quality of psychiatric care one receives can be so substantial a deviation from accepted standards as to evidence deliberate indifference to those serious psychiatric needs."). Nevertheless, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). "In order to avoid dismissal under § 1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than de minimis." Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1312-13 (11th Cir. 2002).

38

AO 72A
(Rev 8/82)

The meaning of the phrase "greater than de minimis," however, is far from clear. At least one district court in this Circuit has held that "diarrhea, vomiting, cramps, nausea, and head aches from eating spoiled food " are *de minimis* injuries, precluding the recovery of compensatory damages. Watkins v. Trinity Serv. Group Inc., Case No. 8:05-cv-1142, 2006 U.S. Dist. LEXIS 85592, at \*10-\*11 (M.D. Fla. Nov. 27, 2006). See also Daniels v. Beasley, Case No. 07-20015, 2007 U.S. App. LEXIS 18137, at \*1-\*2 (5th Cir. July 30, 2007) (unpublished opinion) (concluding that claim failed based on prisoner's receipt of "wrong medication, which resulted in excessive sleep, a loss of appetite, and a temporary loss of vision," because, *inter alia,* prisoner failed to show that "his injuries were more than de minimis" under § 1997e(e)); Sneed v. Hunt County Med. Dep't, Case No. 3-05-CV-2032, 2006 U.S. Dist. LEXIS 3479, at \*7 (N.D. Tex. Jan. 31, 2006) (holding that prisoner's allegations, "that he suffered 'discomfort to mental health, lack of sleep, [and] anxiety attack[s]' as a result of not receiving his medication," were "insufficient to establish 'physical injury' under the PLRA"). But see, e.g., Munn v. Toney, 433 F.3d 1087, 1089 (8th Cir. 2006) (holding that plaintiff's allegations of "headaches, cramps, nosebleeds, and dizziness," as a result of being denied his prescribed blood-pressure treatment, survived § 1997e(e) review).

39

AO 72A
(Rev.8/82)

It appears that § 1997e(e), when applicable, bars the recovery of compensatory damages, but the availability of punitive and/or nominal damages in certain cases is still an open question in this Circuit. See Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003) (concluding that "[n]ominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages," but remanding to district court to determine whether prisoner complaint "could be liberally construed to request nominal damages"). See also Boxer X v. Donald, 169 Fed. Appx. 555, 558-59 & n.1 (11th Cir. 2006) (unpublished opinion) (noting that Eleventh Circuit has yet to decide whether, absent a showing of physical injury as required by § 1997e(e), nominal or punitive damages are unavailable).

### 2. The parties' dispute

Defendants argue that Plaintiff's claims that "he was anxious, experienced nausea and vivid nightmares and had fluctuating blood pressure and hallucinations" are insufficient to satisfy the § 1997e(e) physical injury requirement. [Defs.' Reply Br. at 10. See also Defs.' Supp. Br. at 10-11.] Plaintiff responds that "he was on a mental 'roller coaster ride' due to Coweta County's repeatedly 'crashing him, cold

40

turkey' from extended periods of heavy prescription use of Xanax,"[9] which "unnecessary mental abuse was the main contributor to his suicide attempt on or about January 23, 2005." [Pl.'s Resp. at 16.] Plaintiff states that "this near death experience was in fact a physical injury." After a three-day recovery period at a hospital psychiatric unit, Plaintiff returned to the Jail, where he was once again "crashed" off his prescribed medication, "endangering him of seizure and coma," and causing him "mental torment." Plaintiff contends that his mental suffering was so severe that it amounted to "serious physical harm." He also claims that, even without physical injury, he is entitled to punitive damages for this serious harm. [Id. at 16-18.]

### 3.    Analysis

In his amended complaint, Plaintiff claims that "he suffered from illusions in a reduced mental state" and was "near a nervous breakdown" as the result of the denial of Xanax in January 2005. [Doc. 8, ¶ IV & Part IV attached page 1.] In his affidavit, Plaintiff asserts that he experienced "5 days in mental agony," from January 26, 2005, until on or about January 31, 2005, consisting of "agonizing anxiety,

---

[9] Once again, Plaintiff refers to his prior incarcerations at the Jail, in August and November 2004, which are not at issue herein.

41

AO 72A
(Rev.8/82)

nausea, vivid nightmares, fluctuating blood pressure, and audio and visual hallucinations." [Pf.'s Aff. ¶¶ 22-24; see Pf.'s Exs. E22-E24.] However, one of Plaintiff's own exhibits refutes his claim that his "fluctuating blood pressure" constituted a physical injury. [See Pf.'s Ex. E22 (indicating that from January 28, 2005, through January 30, 2005, Plaintiff's six systolic blood pressure readings (two per day) ranged from a low of 116 to a high of 130, with an average reading of 123, and his diastolic readings ranged from a low of 80 to a high of 90, with an average reading of 85).]

Plaintiff's remaining symptoms – anxiety, nightmares, and hallucinations – do not rise to the level of a physical injury that is "greater than de minimis." Moreover, although Plaintiff did seek treatment for his "cold symptoms" during the five-day period at issue, he apparently did not complain of nausea or any other physical symptom as a result of Xanax withdrawal, stating only that he felt "agitated." [See Nurse Adcock Aff. ¶ 4 & Attach. A.] Accordingly, pursuant to 42 U.S.C. § 1997e(e), Plaintiff may not obtain compensatory damages based on his denial-of-Xanax claim.[10]

---

[10] However, Plaintiff might have been able to obtain punitive or nominal damages on his denial-of-Xanax claim if this claim otherwise were to survive summary judgment review, which, as discussed in Section IV.D.1.b.(1), *infra*, it does not.

42

AO 72A
(Rev.8/82)

## C. Col. Blake's supervisory liability

### 1. The legal framework

Noting the well-established rule "that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability," the Eleventh Circuit has stated that, instead, a supervisor is individually liable only when he "personally participates in the alleged unconstitutional conduct or when there is a causal connection between [his] actions . . . and the alleged constitutional deprivation." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003). This causal connection can be established by showing that the supervisor knew about and failed to correct a widespread history of abuse or had a custom or policy that resulted in a constitutional violation, or that the "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Id. (Internal quotations omitted). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." Id.

43

AO 72A
(Rev.8/82)

## 2.    The parties' dispute

Col. Adcock asserts that he cannot be held liable for the violations alleged by Plaintiff because he played no role in setting the Jail's policy regarding medications, and he did not deny Plaintiff medications or a transfer out of maximum security detention. [Defs.' Supp. Br. at 11-12.]

Plaintiff responds that Col. Adcock, the administrator of a small jail, who, according to Sheriff Yeager, "does indeed run the jail," cannot deny all responsibility for Plaintiff's mis-classification as a maximum security prisoner and for the enforcement of the Jail's "no controlled substances" policy. [Pf.'s Resp. at 18.] Plaintiff asserts that Col. Adcock refused Cpl. Morgan's and Sgt. Homer's separate inquiries as to whether Plaintiff might be removed from dormitory A-6; ignored the three letters Plaintiff sent to him regarding Plaintiff's treatment at the Jail; and acted as the final decisionmaker with respect to Plaintiff's housing, as evidenced by Sgt. Homer's comments that "she was not moving anybody" and that "she wasn't calling Col. Adcock at home on a weekend." [Id. at 19-20.]

## 3.    Analysis

Although Col. Adcock may not be held liable in his individual capacity simply because he "runs the jail," as Plaintiff suggests, he may be held liable if he knew

44

about or was personally involved in any decision that violated Plaintiff's constitutional rights, or if he enforced a custom or policy that resulted in a violation. See Cottone, 326 F.3d at 1360. Based on these standards, Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether Col. Adcock may be held liable in his individual capacity. [See, e.g., Pl.'s Ex. E25 at 1 (Plaintiff's February 7, 2005, letter to Col. Adcock, wherein Plaintiff states he "was told by all [medical personnel at the Jail] that Zanex [sic] is not allowed in this jail by orders of Nurse Jennie Adcock and yourself").][11] At a minimum, there is a genuine issue as to whether Col. Adcock enforced a "controlled substances" policy that, by longstanding practice, resulted in deliberate indifference to one or more of Plaintiff's serious medical needs.

Moreover, a county official may be held liable in his official capacity if a constitutional violation resulted from (1) "an action taken or policy made" by a final policymaker for the county in the "area of [its] business" at issue, or (2) "a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir.

---

[11] Although Defendants characterize such statements as hearsay [see Defs.' Reply at 4], these statements, and others like them, may be admissible under Fed. R. Evid. 801(d)(2)(D) as admissions of a party-opponent. See Sect. II, supra.

45

1995). See <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 n.55, 694 (1978) (noting that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent," and stating that a local government may be held liable under § 1983 "when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury"); <u>Grech v. Clayton County</u>, 335 F.3d 1326, 1329-30 & nn.5-6 (11th Cir. 2003) (en banc) (discussing official-capacity liability of county officials). See also <u>Purcell v. Toombs County</u>, 400 F.3d 1313, 1325 & n.27 (11th 2005) (concluding that "Georgia . . . sheriff's authority and duty to administer [his] jail . . . flows from the State, not [the] County" – entitling him to Eleventh Amendment immunity from suit for damages in his official capacity, but failing to reach same issue with respect to jail administrator because district court did not address it and appellant did not raise it); <u>Sanders v. Langley</u>, Case No. 1:03-cv-1631-WSD, 2006 U.S. Dist. LEXIS 21180, at *29-*32 (N.D. Ga. Mar. 29, 2006) (Duffey, J.) (denying Eleventh Amendment immunity to Georgia sheriff on prisoner's claims of deliberate indifference to his serious medical needs). Accordingly, Col. Adcock is not insulated from liability herein, either in his individual or official capacity, based on his position as a supervisor at the Jail.

46

AO 72A
(Rev.8/82)

However, punitive damages are unavailable in a suit against a county and, hence, in a suit against a county employee in his or her official capacity. See, e.g., Alexander v. Fulton County, 207 F.3d 1303, 1322 n.14 (11th Cir. 2000), overruled on other grounds, Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003) (en banc). See also Newport v. Fact Concerts, 453 U.S. 247, 271 (1981) (stating that "a municipality is immune from punitive damages under 42 U.S.C. § 1983").

## D. The elements of a constitutional violation

To prevail on a claim for relief under 42 U.S.C. § 1983, a plaintiff must establish that an act or omission committed by a person acting under color of state law deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. See Hale, 50 F.3d at 1582.

### 1. Deliberate indifference to a serious medical need

#### a. The legal framework

The Eighth Amendment prohibits indifference to a serious medical need so deliberate that it "constitutes the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (internal quotations omitted). To demonstrate deliberate indifference, a plaintiff must show both "an objectively serious medical need" and the defendant's subjective knowledge of, and more than negligent

47

disregard of, that need. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003). See also Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994) (noting that "a 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"). "A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999) (noting that "prison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain").

Negligence, however, even rising to the level of medical malpractice, does not constitute deliberate indifference. McElligott, 182 F.3d at 1254. See also Hinson v. Edmond, 192 F.3d 1342, 1345 (11th Cir. 1999) (noting that it is well-settled that "medical malpractice–negligence by a physician–is insufficient to form the basis of a claim for deliberate indifference"), amended by 205 F.3d 1264 (2000); Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995) (noting that "[m]ere negligence in diagnosing or treating a medical condition is an insufficient basis" for a deliberate

48

indifference claim). Nor does a simple disagreement over a diagnosis or course of treatment constitute deliberate indifference. As long as the medical treatment provided is "minimally adequate," a prisoner's preference for a different treatment does not give rise to a constitutional claim. See Harris v. Thigpen, 941 F.2d 1495, 1504-05 (11th Cir. 1991); see also Adams, 61 F.3d at 1547 (concluding that the medical provider's "failure to administer stronger medication" to a prisoner who subsequently died was "a medical judgment and, therefore, an inappropriate basis for imposing liability under section 1983").

b.    **The parties' dispute**

Defendants argue that there is no causal connection between their actions and Plaintiff's alleged injuries because staff doctors, not Col. Adcock or Nurse Adcock, made the decisions regarding Plaintiff's medications. [Defs.' Supp. Br. at 13-14.] They also argue that Plaintiff's claims amount to no more than a disagreement over the course of treatment he received, and that "Plaintiff's need for Xanax for anxiety and more attention to his cyst were not sufficiently serious medical needs to make the refusal a constitutional violation." [Id. at 14-15.] Defendants argue further that their actions did not constitute deliberate indifference because, on each occasion when Plaintiff did not receive his prescribed medications, "he was given other

49

AO 72A
(Rev.8/82)

medications." Finally, they contend that substituting Motrin for Vicodin does not give rise to an Eighth Amendment violation. [Id. at 17.]

Noting that no staff doctor has submitted an affidavit in support of Defendants' motion for summary judgment, Plaintiff argues that Nurse Adcock's "very cursory substitution" of Motrin for Vicodin – without having Plaintiff examined by a doctor – is constitutionally infirm, as demonstrated by the prescription of stronger pain medication by GDOC doctors just two weeks later. [Pl.'s Resp. at 21-22.] Plaintiff also claims that the emotional distress he suffered as a result of repeated denials of Xanax and the injuries he suffered in inmate Hardy's assault are sufficient to show a causal connection between his injuries and Defendants' actions and omissions. [Id. at 22-23.] Finally, Plaintiff asserts that the "twice denial of [his] Xanax and the resulting mental 'roller coaster ride' that subsequently resulted in a suicide attempt and unnecessary mental torture"; the substitution of the ineffective Motrin for the prescribed Vicodin when he was in severe pain after Hardy's assault; and the total lack of treatment for his cysts before July 12, 2005, demonstrate deliberate indifference to his serious medical needs. [Id. at 23-27.]

50

c.    **Analysis**

(1)    **Denial of Xanax**

When Plaintiff arrived at the Jail on or about January 26, 2005, he had a prescription for three medications to address his mental condition – Lexapro (10 mg daily), Trazodone (50 mg daily), and Xanax (1.5 mg daily). [Pf.'s Ex. E18.] Jail officials discontinued the Xanax, without substituting "other medications," as they claim, and without attempting to wean Plaintiff from the Xanax by gradually reducing his dosage. See Burdette v. Butte County, 121 Fed. Appx. 701, 702 (9th Cir. 2005) (unpublished opinion) (concluding that prisoner, who had suffered seizure and fall while awaiting pill call, had failed to show that decision "to taper him off of Xanax and prescribe Imipramine" constituted deliberate indifference to a serious medical need because "[i]t is undisputed that the risk of serious side effects from tapering a patient off of Xanax is statistically slight").

Even so, the gravamen of Plaintiff's claim that he had a serious medical need for Xanax is based on his alleged suffering during the approximately five days when he was on suicide watch at the Jail, from January 26 until January 31, 2005. [See Pf.'s Aff. ¶¶ 22-24.] However, Plaintiff does not assert that he informed Defendants of the alleged seriousness of his mental condition during that critical five-day period,

51

and the medical records reflect that he did not, instead complaining only of "cold symptoms." [See Nurse Adcock Aff. ¶ 4 & Attach. A.]

Given that Plaintiff was receiving other "psychotropic medication" during that time period, this Court cannot conclude that the record before it sets forth a genuine issue of material fact as to whether Defendants were *deliberately indifferent* to a serious medical need resulting from the denial of Xanax to Plaintiff. It appears to the Court that, at most, Plaintiff's denial-of-Xanax claim amounts to a claim of medical negligence, which cannot form the basis for an Eighth Amendment claim of cruel and unusual punishment. Although, in *Steele*, the Eleventh Circuit reversed the district court's grant of summary judgment to a doctor who had denied a patient his prescribed psychotropic medication, it did so in light of evidence that the prescribing medical team had informed the defendant-doctor that his patient was a "potential suicide risk" without the medication. See Steele, 87 F.3d at 1268-71.

Here, by contrast, there is no indication in the record that any outside physician, or that Plaintiff himself, for that matter, informed the Jail medical staff that Plaintiff was a potential suicide risk or otherwise had a serious medical need for Xanax during the time period at issue. In fact, Plaintiff states that the physician at the psychiatric unit who treated him prior to his transfer to the Jail determined that he

52

AO 72A
(Rev.8/82)

was "non-suicidal" upon his release from the unit on January 26, 2005. [Pf.'s Aff. ¶ 23.] Moreover, the Jail's Medical Notes for the weeks following Plaintiff's release from suicide watch – made by, among others, Dr. Scott, apparently the staff psychiatrist – indicate that, on February 1, 2005, Plaintiff was "no longer suicidal"; on February 2 and February 16, 2005, he was "not depressed"; and on February 14, 2005, although he claimed that he was "hearing voices" and "not sleeping," he slept "during the day" and did not appear "psychotic." [Pf.'s Exs. E20, E23, E24.] Nowhere in the above Medical Notes, or in any other record evidence, does it appear that Plaintiff complained of "extreme" or "agonizing" anxiety, "horribly torturous nightmares," or any other profound mental disturbance as a result of being denied Xanax, as he has asserted in various pleadings herein. [See Doc. 8; Pf.'s Aff. ¶ 23.] Accordingly, without record evidence that Defendants were aware that Plaintiff had a serious medical need for Xanax, there is no genuine issue of material fact as to whether Defendants' denial of Xanax constituted deliberate indifference. Defendants are entitled to summary judgment on Plaintiff's denial-of-Xanax claim.

### (2)    Treatment of Plaintiff's cysts

It is unclear from the record when, if ever, Plaintiff's cysts became a serious medical need to which Defendants might have been deliberately indifferent. See

53

Clark v. Argutto, 221 Fed. Appx. 819, 823, 824 (11th Cir. 2007) (unpublished opinion) ("assuming arguendo that the cyst [on prisoner's wrist] was an objectively serious medical need," but affirming summary judgment to defendants because prisoner "received an MRI and has not shown deliberate indifference to a serious medical need"). However, this Court need not address the merits of Plaintiff's claim in this regard because there is not a genuine issue of material fact as to whether Plaintiff attempted to exhaust his administrative remedies with respect to this claim. See Section IV.A.3., *supra*. Accordingly, the instant claim will be denied without prejudice.

### (3)    **Denial of Vicodin**

It is undisputed that Plaintiff returned from the hospital in July 2005 with a prescription for Vicodin, for which Nurse Adcock substituted Motrin. Although Nurse Adcock states that Dr. Burnett approved the substitution, her notes of July 13, 2005, do not make this clear. [See Nurse Adcock Aff. ¶ 8 & Attach. H.] Moreover, Defendants do not attempt to show that Motrin provides pain relief equivalent to that provided by Vicodin. In that regard, their citation of a Tenth Circuit case – holding that the substitution of Tylenol for dentist-prescribed Motrin passed constitutional muster – is unpersuasive. [See Defs.' Supp. Br. at 17.] Furthermore, in reversing a

54

district court's grant of summary judgment to a doctor and nurse who had prescribed ineffective medications for a prisoner's severe pain (who "basically did nothing to alleviate that pain"), the Eleventh Circuit held that it was a jury question whether the defendants had been deliberately indifferent to the prisoner's serious medical needs. McElligott, 182 F.3d at 1257-58 (citing with approval Third Circuit opinion "finding that inmate stated a claim for deliberate indifference based on denial of post-operative pain medication," and noting that, "although plaintiff was provided with aspirin, this may not constitute adequate medical care") (internal quotations omitted). As noted *supra*, "deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment." Seals v. Shah, 145 F. Supp. 2d 1378, 1384 (N.D. Ga. 2001) (Thrash, J.).

Nevertheless, it is undisputed that neither of the two community physicians who examined Plaintiff in July 2005, shortly after his return to the Jail from the hospital emergency room, prescribed anything stronger than Motrin. [Nurse Adcock Aff. ¶ 9 & Attachs. I, J.] Plaintiff's assertion that these doctors adapted their medical recommendations to the Jail's policy on controlled substances is entirely speculative and unsupported by actual evidence. Moreover, the Emergency Room Note for Plaintiff's July 12, 2005, hospital visit immediately after his altercation with Hardy

55

indicates that Plaintiff was "in *mild* distress" and only "complain[ed] of *some pain* to the left wrist and back of the hand where he was struck with a broom handle." [Pf.'s Ex. E38 at 1 (emphasis added).] Accordingly, the Court finds that, at most, Plaintiff's denial-of-Vicodin claim amounts to a disagreement over a course of treatment recommended by different medical doctors, none of whom is a defendant herein. The Court concludes that there is no genuine issue of material fact as to whether this claim sets forth an Eighth Amendment violation, which it does not. See, e.g., Harris, 941 F.2d at 1504-05. Therefore, Defendants are entitled to summary judgment on Plaintiff's denial-of-Vicodin claim.

### 2. Failure to protect Plaintiff from assault by inmate Hardy

#### a. The legal framework

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). However, not every instance of inmate on inmate violence "translates into a constitutional liability for prison officials responsible for the victim's safety." Id. at 834. A violation occurs "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." Marsh v. Butler County, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc) (internal

56

quotations omitted). To survive summary judgment, a Plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Hale, 50 F.3d at 1582. "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983 . . . . The known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted). Moreover, to be deliberately indifferent, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference.*" Farmer, 511 U.S. at 837 (emphasis added).

b. **The parties' dispute**

Defendants argue that Sgt. Homer was unaware of a substantial risk to Plaintiff from inmate Hardy prior to their fight, and she was not on duty at the time of the fight, so that she cannot be held liable for the injuries that Hardy inflicted upon Plaintiff. [Defs.' Supp. Br. at 13.] Defendants contend that "general hostilities" in a prison dormitory do not constitute a substantial risk of harm. [Defs.' Reply at 14.] They assert that by removing inmate Roberts from dormitory A-6, Sgt. Homer took

57

the action she felt necessary to prevent violence between Roberts and Plaintiff, without realizing that Hardy's friendship with Roberts gave cause to be concerned about Plaintiff's welfare. Defendants argue that although, in hindsight, Sgt. Homer "could have taken a different course of action, the Constitution does not provide a forum for second-guessing." [Defs.' Supp. Br. at 18-20.]

Plaintiff responds by asserting that he suffered escalating abuse from Roberts and Hardy from the time Roberts was assigned to dormitory A-6; that Sgt. Homer was aware of the "strong connection" between these two "gangstas"; and that, given the repeated warnings from Plaintiff and others, neither Sgt. Homer nor Col. Adcock could have been unaware of the danger that Hardy posed to Plaintiff. [Pf.'s Resp. at 28-30; see Pf.'s Ex. E31 (Sgt. Homer's 7-2-05 incident report, noting, "Problems w/ inmates 'dividing up.' Black vs. White."); Pf.'s Ex. E33 (Sgt. Homer's 7/03/05 incident report, referring to Roberts and Hardy as "close," and noting that "these two have the potential to cause more problems").]

Plaintiff states that a Jail officer informed him that Hardy had been transferred into dormitory A-6 after being involved in a fight with two other inmates, who "were able to get the best of him (Hardy) with a broom handle." [Pf.'s Aff. ¶ 33.] Shortly thereafter, Hardy assaulted two Mexicans inmates in A-6, slamming a cell door on the

58

hand of one of them and severing the last joint on one of his fingers, which Plaintiff knew because he and two other inmates had helped clean up the blood and had found the severed joint. [Id. ¶ 37.]

According to Plaintiff, the Jail officers knew about Hardy's propensity to verbal abuse, which Hardy displayed on a regular basis, and advised Plaintiff to "steer clear" of Hardy because "he is a bad one." [Id. ¶¶ 34-35, 38.] Plaintiff states that Hardy's co-defendants on aggravated assault and battery charges were removed from A-6 prior to Hardy's arrival there "to protect them from Hardy." [Id. ¶ 32.] When Roberts was placed in A-6 in May 2005, he and Hardy "became abusive toward [Plaintiff], threatening violence and calling [him] 'cracker.'" [Id. ¶ 36.] By July 2, 2005, there were "near riot conditions" in A-6, with "nearly all blacks . . . now abusive" to him, and continuing threats of violence. [Id. ¶¶ 40, 42-43.]

c. **Analysis**

Hardy's allegedly belligerent attitude towards whites and, in particular, Plaintiff, and his allegedly repeated acts of violence at the Jail; his friendship with Roberts, who apparently shared Hardy's feelings and who nearly came to blows with Plaintiff; Nurse Webb's alleged, though disputed, statement that guards at the Jail anticipated a fight between Hardy and Plaintiff at some time not long before the

59

assault; the allegedly repeated warnings to Jail officials, from Plaintiff and others, that Hardy posed a danger to Plaintiff – all these facts, alleged by Plaintiff or admitted by Defendants, suggest that Hardy's close proximity to Plaintiff constituted a risk of harm to Plaintiff. Moreover, a reasonable response to this risk would have been to separate Plaintiff from Hardy. See Hale, 50 F.3d at 1583-85 (reversing grant of summary judgment to County Sheriff because, *inter alia,* there was evidence "of several reasonable measures to reduce the risk of violence"). Nevertheless, as discussed *infra*, Plaintiff's allegations, serious though they may be, do not establish a genuine issue of material fact as to whether Sgt. Homer and/or Col. Adcock not only knew of facts suggesting that Plaintiff faced a substantial risk of serious harm from Hardy, but also subjectively drew the inference that he did. See Farmer, 511 U.S. at 837.

Carter v. Galloway, 352 F.3d 1346 (11th Cir. 2003), is instructive in this regard. In *Carter*, the plaintiff, who had suffered a knife attack at the hands of his cellmate, appealed the district court's grant of summary judgment, in favor of two prison officials, on the plaintiff's claim that the officials had been deliberately indifferent to a substantial risk of serious harm posed by his cellmate. Id. at 1347. The Eleventh Circuit affirmed the grant of summary judgment because there was

60

insufficient record evidence of the defendants' "subjective awareness" of such a risk.

Id. at 1349.

> During Plaintiff's time [with his] cellmate . . ., Defendants clearly knew that [the cellmate] was a "problem inmate" with a well-documented history of prison disobedience and had been prone to violence. Defendants also had specific notice from Plaintiff that [the cellmate] acted crazy, roaming his cell like a "caged animal." But before Defendants' awareness arises to a sufficient level of culpability, there must be much more than mere awareness of [the cellmate's] generally problematic nature.

Id.. Despite the plaintiff's many complaints to the defendants, he never directly told them that his cellmate had threatened him, although he did inform them of his cellmate's remark that the plaintiff would help with the cellmate's plan to fake his own hanging "one way or another," which, apparently, the plaintiff took as a threat.

Id. at 1349-50.

> To assume that Defendants actually made the inference that [the cellmate's] statement constituted a serious threat would assume too much. Defendants would have had to read imaginatively all derogatory and argumentative statements made between prisoners to determine whether substantial risks of serious harm exist. We do not view the summary judgment record as supporting a contention that Defendants drew the inference or should have drawn the inference from [the cellmate's] "one way or another" comment as a serious threat, leaving Plaintiff exposed to any substantial risk of serious harm.

> Defendants arguably should have placed Plaintiff elsewhere but merely negligent failure to protect an inmate from attack does not justify

61

liability under section 1983. Defendants only possessed an awareness of [the cellmate's] propensity for being a problematic inmate; to find Defendants sufficiently culpable would unduly reduce awareness to a more objective standard, rather than the required subjective standard set by the Supreme Court. Such a generalized awareness of risk in these circumstances does not satisfy the subjective awareness requirement.

Id. at 1350 (footnote, citation, and internal quotations omitted). See also Lavender v. Kearney, 206 Fed. Appx. 860, 863-64 (11th Cir. 2006) (unpublished opinion) (affirming summary judgment for defendant because, although he knew of assailant's "violent nature and knew of his racial animus against white residents," "there was no evidence he was aware that [assailant] posed a specific risk" to plaintiff; and noting that "[g]eneral knowledge about an inmate's violent tendencies, without more specific information about the risk, does not constitute deliberate indifference"). McBride v. Rivers, 170 Fed. Appx. 648, 655 (11th Cir. 2006) (unpublished opinion) (affirming grant of summary judgment to defendants because, although plaintiff, a victim of inmate violence, had informed defendants "that he feared for his life" if placed in same cell with his eventual assailant, plaintiff "did not identify a specific prior incident, from which the defendant could infer that a substantial risk existed").

Likewise here, although Plaintiff asserts that Hardy threatened him repeatedly in the days before the assault, Plaintiff has not identified any specific "serious threat"

62

from Hardy, which he then reported to Sgt. Homer, Col. Adcock, or any other Jail officer prior to July 12, 2005. See Carter, 352 F.3d at 1350 (discussing "serious threat" requirement and noting that "derogatory and argumentative statements" are not equivalent to threats). The only specific threat that Plaintiff sets forth in the record is Hardy's alleged threat on the morning of July 12, 2005, shortly before the assault occurred, that he would "swing on" Plaintiff, by which time it was too late for Sgt. Homer, who was not on duty at the time, or Col. Adcock, who did not personally witness the threat, to do anything to help Plaintiff. [See Pf.'s Aff. ¶ 50; see also Doc. 8-2, Part IV attach. ¶¶ 19-20 (alleging that on or about July 5, 2005, after Roberts had been transferred, Plaintiff "began receiving renewed threats" from Hardy, and that on July 12, 2005, approximately thirty minutes before the assault, Hardy threatened Plaintiff in the breakfast line, "attempted a sneak attack from behind on Plaintiff," and spit on Plaintiff "in plain view" of three officers).]

The fact that Hardy was a "problem inmate" with "violent tendencies" simply "does not satisfy the subjective awareness requirement." See Carter, 352 F.3d at 1350; Lavender, 206 Fed. Appx. at 863. At most, Plaintiff has demonstrated that Defendants were negligent in not separating him from Hardy, but negligence is not the constitutional standard by which Defendants' actions or omissions are to be

63

judged. See Carter, 352 F.3d at 1350. Sgt. Homer asserts that she felt that the transfer of Roberts away from A-6 dormitory on July 3, 2005, "alleviated the[] problems" there. [Homer Aff. ¶ 5.] There simply is insufficient evidence in the record to allow the Court, or a jury, to second guess Sgt. Homer's assertion that she was not aware of a substantial risk of serious harm to Plaintiff during the nine days that intervened between the transfer of Roberts and the assault by Hardy. Accordingly, although the Court is sympathetic with the misfortune that befell Plaintiff as a result of that assault, Sgt. Homer and Col. Adcock are entitled to summary judgment on Plaintiff's claim that they were deliberately indifferent to the risk of harm posed by Hardy.

* * * *

AO 72A
(Rev.8/82)