[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10474

_____

D.C. Docket No. 3:12-cv-00107-RV-EMT

ESTATE OF JASON JERRY OWENS,
GRETCHEN LEEPER,
as personal representative,

Plaintiffs - Appellants
Cross Appellees,

GAYLE BALLARD,
as personal representative,

Plaintiff,

versus

GEO GROUP, INC.,
d.b.a. Graceville Correctional Facility,
WARDEN, GRACEVILLE CORRECTIONAL FACILITY,
TONY STEWART,
Chief of Security Graceville Correctional Facility,
GREG DAVIS,
Instructor in his individual and official capacity,

Defendants - Appellees -
Cross Appellants,

JESSIE E. STRICKLAND,
Correctional Officer in his individual and official capacity,

Defendant.

_____

Appeals from the United States District Court
for the Northern District of Florida
_____

(August 25, 2016)

Before TJOFLAT and MARCUS, Circuit Judges, and STEELE,[*] District Judge.

PER CURIAM:

This appeal arises out of an inmate-on-inmate attack in a Florida prison that resulted in the death of Jason Owens. Gretchen Leeper, as the personal representative of Owens's estate, sued GEO Group, Inc. ("GEO"), Warden Mark Henry, Assistant Warden Tony Stewart, teacher Greg Davis, and security guard Jessie E. Strickland (collectively, the "Defendants"), in the United States District Court for the Northern District of Florida, alleging a deliberate indifference claim under the Eighth Amendment of the Constitution and a wrongful death claim under Florida law. Initially, the district court granted summary judgment in favor of the Defendants on Leeper's deliberate indifference claim, but denied it as to her Florida wrongful death claim and retained supplemental jurisdiction over that matter. Two months later, the district court sua sponte reconsidered its order, declined to exercise supplemental jurisdiction over the wrongful death claim, and

_____

[*] Honorable John E. Steele, United States District Judge for the Middle District of Florida, sitting by designation.

2

dismissed the remainder of the case without prejudice so that Leeper could refile the wrongful death claim in state court.

Leeper appealed, challenging the district court's decision to grant summary judgment in favor of the Defendants on her deliberate indifference claim. The Defendants cross-appealed, in turn, arguing that the district court wrongfully denied summary judgment as to Leeper's Florida wrongful death claim, and abused its discretion by declining to retain supplemental jurisdiction over that claim. Leeper then moved us to dismiss the Defendants' cross-appeal, which a panel of this Court granted in part; we dismissed the cross-appeal from the district court's order which denied summary judgment on the state wrongful death claim.[1] However, we allowed the cross-appeal from the district court's order declining to exercise supplemental jurisdiction over the state law claim to proceed. After thorough review, and having the benefit of oral argument, we affirm the judgment of the district court granting summary judgment to the Defendants on the Eighth Amendment deliberate indifference claim and we also affirm the district court's determination to decline to exercise supplemental jurisdiction over the state law claim.

I.

---

[1] We continue to adhere to the prior panel's dismissal of the Defendants' cross-appeal of the district court's denial of summary judgment as to the state wrongful death claim. As we've said, "the denial of a motion for summary judgment is not a final decision under 28 U.S.C.A. § 1291." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983).

A.

First, we are unpersuaded by Leeper's claim that the district court erred by granting summary judgment in favor of the Defendants on her Eighth Amendment deliberate indifference claim.  We review de novo the district court's decision on a motion for summary judgment, viewing the facts in the light most favorable to the plaintiff.  Terrell v. Smith, 668 F.3d 1244, 1249-50 (11th Cir. 2012).  Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quotation omitted); see also Fed. R. Civ. P. 56(a).  "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  Summary judgment is, therefore, warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

Section 1983 creates a private civil rights cause of action for the deprivation of federal rights by persons acting under color of state law.  42 U.S.C. § 1983.  "It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."

4

Helling v. McKinney, 509 U.S. 25, 31 (1993). "The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)) (alterations and quotations omitted). "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." Farmer, 511 U.S. at 833 (citation omitted). Thus, it has long been recognized that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." Id. (quotation and alteration omitted). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." Id. at 834; Purcell v. Toombs County, 400 F.3d 1313, 1321 (11th Cir. 2005) ("[A] prison custodian is not the guarantor of a prisoner's safety." (quotation omitted)).

"A prison official violates the Eighth Amendment when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." Caldwell, 748 F.3d at 1099 (quoting Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003)) (quotation and emphasis omitted). To prevail on this kind of § 1983 claim, the plaintiff must

establish: (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) a causal connection between the defendants' conduct and the Eighth Amendment violation. Brooks v. Warden, 800 F.3d 1295, 1301 (11th Cir. 2015). The determination of a substantial risk of serious harm is measured against an objective standard. Caldwell, 748 F.3d at 1099. The alleged condition must be "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010). Thus, there must be a "strong likelihood" of injury, "rather than a mere possibility," before an official's failure to act can constitute deliberate indifference. Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (quotations omitted). Moreover, the risk must be actual, rather than potential or speculative. See Carter, 352 F.3d at 1349-50. So, for example, a prisoner's exposure to the potential for a fight does not, in and of itself, constitute substantial risk of harm. Purcell, 400 F.3d at 1323 ("In the jail setting, a risk of harm to some degree always exists by the nature of its being a jail.").

Whether a defendant was deliberately indifferent to a substantial risk, in turn, requires both an objective and a subjective analysis. Caldwell, 748 F.3d at 1099. The objective component is satisfied by evidence that the official disregarded the substantial risk by failing to act in an objectively reasonable way to alleviate the risk. Id. And, "[t]o satisfy the subjective component, the prisoner

6

must allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." Richardson, 598 F.3d at 737.  In this context, deliberate indifference requires: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that amounts to more than mere negligence.  Id.; see also Ray v. Foltz, 370 F.3d 1079, 1083 (11th Cir. 2004) ("Deliberate indifference is not the same thing as negligence or carelessness."). Thus, a prison official may have subjective knowledge only if he had both knowledge of specific facts from which an inference of risk of serious harm could be drawn, and he actually drew that inference.  Carter, 352 F. 3d at 1349.  And, therefore, a plaintiff's claim will fail as a matter of law in the absence of actual knowledge of the substantial risk, because to hold otherwise would impermissibly vitiate the subjective component of the analysis.  See Farmer, 511 U.S. at 837-38.

Actual knowledge of the substantial risk is required for one to deliberately disregard it; constructive knowledge of the risk is insufficient to establish deliberate indifference under the Eighth Amendment.  So, where there are multiple defendants who, allegedly, have been deliberately indifferent, "[e]ach individual [d]efendant must be judged separately and on the basis of what that person knows."  Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008).  The knowledge of one defendant may not be imputed to another.  The resulting harm may not be determinative; the essential timeframe under analysis is restricted

7

to the time period <u>before</u> the injury has occurred, when the official had knowledge of the substantial risk of harm, but chose to act unreasonably. <u>See</u> <u>Purcell</u>, 400 F.3d at 1320 (courts "[can]not allow the advantage of hindsight to determine whether conditions of confinement amounted to 'cruel and unusual' punishment"); <u>see also</u> <u>Brooks</u>, 800 F.3d at 1302 ("The very fact of an injury may, in some circumstances, be a factor in assessing that <u>ex ante</u> risk, but it cannot be sufficient on its own to prove that a substantial risk existed.").

B.

The essential facts, for purposes of our summary judgment analysis, are these. Graceville Correctional Facility is a state prison in Jackson County, Florida. Opened in 2007, it is run by GEO pursuant to a contract with the Florida State Department of Management Services. Graceville is a designated educational facility, and most inmates participate in educational programs. It has 300 staff members and houses some 1,800 inmates falling into various security grades, including community, minimum, medium, and close management (but not maximum-security or death row inmates).

In 2010, Jason Owens (a medium-security inmate), Jason Ridge (a close-security inmate) and other inmates carrying various mixed security classifications attended a horticulture class taught by Greg Davis, who had been an instructor at Graceville since it opened. The horticulture class was designed to teach inmates

basic skills to enable them to work as gardeners and landscapers upon release from prison; the class included lectures as well as practical "hands-on" experience. The lectures were conducted in a classroom situated along a breezeway with other classrooms. It had a single exterior door with a large glass window and two other windows on either side of the door. During the lectures, a security officer was permanently stationed some 25 feet from the classroom door, and a second officer was posted at another gate farther down the walkway. Additional roving security officers also patrolled the area on a regular basis.

If instructor Davis had to be away from his class for a short period of time, it was his regular practice to inform another member of the correctional staff, and that individual would monitor the classroom while Davis was away. Usually, he would ask the permanently stationed officer to monitor the class from outside the room by periodically looking through the door and glass windows. Davis says that he -- and other instructors -- engaged in this practice hundreds of times over several years without any incident or violence of any kind. For her part, Leeper claims that under GEO policy, if an instructor was required to leave his classroom, the instructor was required to secure approval from GEO's Educational Director and to obtain a relief person to supervise his inmates. And, if the relief person was not available, unwritten GEO practice called for that instructor to take his entire class of inmates to a security guard so that the guard could supervise them. Davis

9

had never been disciplined for employing the alternative practice of leaving the inmates inside the classroom and informing the outside security guard when he would step away, which was "consistent with the practice of the department."

On March 9, 2010, the horticulture class was working outside in the garden. At the end of class, while the inmates were returning their tools and getting ready to leave the garden area, inmate Robert (or Donald) Knowles approached Davis with blood dripping on his shirt and pants. Knowles told Davis that he did not know how it happened or who did it, but somehow he "got hit" (or "somebody hit him") with a pickaxe on the back of his head. Knowles did not claim that inmate Ridge had struck him, but Ridge was purportedly the only person in the area at the time Knowles got hurt. Knowles eventually told Davis that he hurt himself, but Leeper asserts that it is "extremely difficult" for a person to self-inflict that kind of injury. There were no eyewitnesses, and nobody came forward to say what had happened to Knowles that day.

The following afternoon, March 10, 2010, the horticulture class met in the classroom. Inmates Ridge and Owens, among others, were both in the class. At about 1:30 p.m., Davis briefly left the room, though the reason why he left is not clear from the record. Upon leaving, Davis kept the door open and told the security officer stationed outside the classroom, Jessie Strickland, that he would be out of the room for a few minutes. Immediately after Davis left the area -- and

10

while Strickland's back was turned -- an inmate is seen on a recorded video closing the door Davis had propped open and returning inside the classroom. What took place inside the room was not video recorded, but eyewitness statements and other evidence reveal that Ridge picked up a large rock or piece of concrete, approached Owens from behind while he was sitting at his desk, and savagely hit him over the head about a dozen times. Afterward, Ridge reopened the classroom door. The entire assault -- from the time Ridge closed the door to the time he struck the final blow and reopened the door -- took 50 seconds, and was done without any warning or provocation. Davis returned to the classroom about eight minutes after he left, and saw Owens lying and bleeding on the floor. Owens would later die from his injuries. Ridge subsequently pled no contest to second degree murder and was sentenced to 25 years in prison.

## C.

Section 1983 plaintiffs like Leeper may advance an Eighth Amendment claim for failure to protect an inmate under two different theories. Under the first theory -- the particularized risk claim -- Leeper may show that Owens was the target of a specific threat or danger, and that the employees subjectively were aware of the individualized danger, yet they failed to act to alleviate that risk. Alternatively, on the second theory -- the dangerous conditions claim -- Leeper may demonstrate that the prison conditions Owens was subjected to were so

dangerous that they resulted in cruel and unusual punishment. But on this record, Leeper has satisfied neither.

As for the particularized threat theory, Leeper must adduce evidence that the individually named employee -- in her case, the horticultural instructor Greg Davis -- had subjective knowledge of the risk of serious harm to the plaintiff. See McElligott v. Foley, 182 F.3d 1248, 1249-50, 1255 (11th Cir. 1999). In Carter, we rejected this kind of claim where the plaintiff, Carter, was a medium-security inmate with no history of violence while in prison. Carter, 352 F.3d at 1347, 1349. Carter was housed with a close-security inmate who had a record of violence in prison, was pending re-classification to maximum-security status, and was known by officials to have caused many problems during his incarceration. Id. at 1348-49. Officials had observed Carter's cell-mate pacing the cell like "a caged animal" as he threatened officers and orderlies. Id. at 1348. Carter requested a reassignment after reporting verbally and in writing that his cell-mate threatened him, was planning to fake a hanging, and was "acting crazy," but prison officials did nothing. Id. & n.7. One week later, the cell-mate stabbed Carter, who then sued, alleging prison officials were deliberately indifferent to his substantial risk of serious harm. Id. In affirming summary judgment for the prison officials on Carter's deliberate indifference claim, a panel of this Court explained:

> During Plaintiff's time as a cellmate of [the assailant], Defendants[] clearly knew that [the assailant] was a "problem inmate" with a well-

documented history of prison disobedience and had been prone to violence. Defendants also had specific notice from Plaintiff that [the assailant] acted crazy, roaming his cell like a "caged animal." <u>But before Defendants' awareness rises to a sufficient level of culpability [to establish a claim for deliberate indifference,] there must be much more than mere awareness of [the assailant's] generally problematic nature.</u> . . . [T]he prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists -- and the prison official must also "draw that inference."

<u>Id.</u> at 1349 (quoting <u>Farmer</u>, 511 U.S. at 837) (emphasis added). While the Court in <u>Carter</u> recognized that the prison officials had a generalized, objective knowledge of the risk, it concluded that summary judgment for the prison officials was appropriate because they lacked the requisite subjective awareness of the risk posed to Carter. We noted that "the inmate never told prison officials that he 'feared' his attacker, never told them that he had been 'clearly threatened,' and never asked to be placed in 'protective custody.'" <u>Rodriguez v. Sec'y for Dep't of Corrs.</u>, 508 F.3d 611, 617 (11th Cir. 2007) (quoting <u>Carter</u>, 352 F.3d at 1349-50). The Court reasoned that if it allowed the claim to continue, the subjective component of the deliberate indifference analysis would have been effectively eliminated. <u>Carter</u>, 352 F.3d at 1350.

The essential problem here too is that there is no evidence of Davis's subjective knowledge. Nothing in the record even remotely suggests that Davis had any belief, suspicion, knowledge, or inclination that Ridge would attack when he did, nor that Davis had actual knowledge that Ridge posed a particularized

13

threat to Owens.  This is not a case, for example, where Ridge and Owens had a prior history of violence, or where they were members of rival gangs, or where there was a known gambling debt or romantic relationship between them, or even where Owens complained to prison officials about feeling unsafe or threatened. Leeper points to allegations from some inmates that Ridge was a "bully" in the class; that he would sometimes talk about "hurting people"; and that several months before he had attacked Owens and "tried to jump" another inmate over a bag of coffee (although it is not clear if these undocumented incidents occurred in the horticulture class, nor what, if anything, Defendants actually knew about them). Leeper, relying on statements made by GEO inmates after she filed her complaint, also says that there is at least speculation that Ridge had hit Knowles with a pickaxe the day before he attacked Owens.  But Leeper cannot rely on statements from inmates about Ridge's prior violence that were taken <u>after</u> the attack on Owens, since Leeper does not argue that GEO or its employees knew the information contained in the statements beforehand.  See Purcell, 400 F.3d at 1320. Moreover, as we've already observed, it is not enough for Leeper to show that Davis constructively should have known of the danger based on Ridge's alleged prior violence.  See Carter, 352 F.3d at 1349.  Even if a jury could conclude that Davis indeed knew of these alleged instances of violence at Ridge's hands, there is

14

nothing in the record showing he drew -- or could have drawn -- any inference that Ridge posed a particularized risk of harm to Owens.

Indeed, the facts in Carter, for example, involved: (1) housing the victim in the same cell, (2) with an inmate who the defendants knew to be violent, and (3) where the victim had repeatedly complained about his attacker.  Id. at 1348-49.  Here, in sharp contrast, Owens: (1) attended a weekday class for a few hours, (2) with Ridge, who did not have a significant history of violence (although he may have "threatened" a few other inmates), and, (3) Owens had never complained to anyone, including Davis, about Ridge.  While Carter was locked in a cell with his attacker for hours every night without direct supervision, Owens was in an open classroom with Ridge and others for only sixty-five seconds before he was attacked.  On this record, and taking all of the facts in the light most favorable to the non-moving party, no GEO employee was subjectively aware of any risk to Owens during the time the classroom was left under the supervision of a roving security officer.  Because Leeper's particularized threat theory plainly fails, the district court did not err in entering summary judgment for the Defendants on this claim.

As for the second theory -- the dangerous prison conditions claim -- Leeper argues that GEO's employees, including Greg Davis, were aware that the conditions surrounding the conduct of Davis's classroom constituted a substantial

danger to Owens's safety, the prison employees were deliberately indifferent to the dangerous conditions, and they caused Owens's death.  Leeper relies primarily on: (1) the education of mixed-custody inmates in the same classroom; and (2) Davis's procedure of leaving the class under the supervision of other roving security officials when he left the room for short periods of time, which Leeper claims violated GEO's written policies.

But in order to succeed on a "prison conditions" theory, a plaintiff cannot rely simply on "occasional [or] isolated attacks by one prisoner on another" but rather must prove "confinement in a prison where violence and terror reign." Harrison v. Culliver, 746 F.3d 1288, 1299 (11th Cir. 2014) (quoting Purcell, 400 F.3d at 1320 ("We accept that an excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm; occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, [but] confinement in a prison where violence and terror reign is actionable." (quotation omitted))).  It is surely true that "[a] prisoner has a right, secured by the [E]ighth [A]mendment to be reasonably protected from constant threat of violence . . . by his fellow inmates."  Purcell, 400 F.3d at 1320 (quotation and alterations omitted). But without showing a regular or constant threat of violence, procedures used by a prison -- even if deficient -- do not amount to deliberate indifference or violate the

16

Eighth Amendment's cruel and unusual punishment clause. Harrison, 746 F.3d at 1299-1300 (quotation omitted).

Leeper has offered no evidence that Owens suffered a constant threat of violence. For starters, the complaint is unequivocal in its assertion that Ridge's attack on Owens was both unprovoked and without warning. Indeed, Owens's March 10, 2010 death was the only known act of violence that occurred in any classroom at Graceville when an instructor stepped outside of a classroom (or for that matter, when an instructor was in a classroom) and relied on roving security and a stationary guard who was only a few feet away. Because the record is devoid of even a single incident of violence caused by the procedures Leeper now challenges, Leeper's argument that the procedures created a constitutionally deficient dangerous condition is without merit.

Indeed, the claims asserted here are far less egregious, and the conditions at Graceville far less dangerous, than those proffered in previous claims that have been rejected by this Court. In Harrison, for example, the plaintiff Harrison's throat had been cut, nearly killing him, in an area of a prison where inmates were not directly within the line of sight of security personnel. 746 F.3d at 1293. Harrison's assault took place in a back hallway of the facility that lacked a permanently stationed security officer, and was supervised only by roving security and intermittent video surveillance. Id. at 1293-94. At the time of the injury,

17

security staff were supervising other inmates. Id. at 1293. Harrison claimed that the defendants were deliberately indifferent to the substantial risk of harm created by the prison's failure to adequately monitor the back hallway. Id. at 1299. He also claimed that prison officials must have known, and did know, that the unmonitored back hallway created an unreasonable opportunity for attacks and reprisals. Id. Prison records reflected that <u>five</u> assaults had occurred on the same hallway in a three-year period, four of which involved weapons. Id. at 1294. It was undisputed that the warden was on actual notice of these five assaults because he signed each of the incident reports. Id. at 1299.

Despite the lack of a permanently stationed security officer and the warden's actual knowledge of prior assaults, a panel of this Court affirmed summary judgment for the defendants on Harrison's deliberate indifference claim. It reasoned this way:

> [The] policies for monitoring the back hallway did not create a substantial risk of serious harm. The evidence shows that, although a detention officer was not permanently stationed on the back hallway, at least one was assigned as a rover with responsibility for monitoring the back hallway. In addition, a camera monitored the back hallway, and although it did not record, it provided a live stream that a detention officer monitored twenty-four hours a day. . . . The limited number of inmate-on-inmate assaults [during the preceding three-year period] indicates that the area was fairly secure already. <u>Although placing a detention officer on the back hallway to monitor inmates may have improved the security at [the facility], [the warden's] decision not to do so did not create a substantial risk of harm</u>.

18

> . . . Although assaults did occur throughout Holman, and some did involve weapons . . . the evidence of inmate-on-inmate assault involving weapons does not indicate that inmates were "exposed to something even approaching the constant threat of violence." Holman is a large institution . . . hous[ing] between 830 and 990 inmates during the relevant time period[.] . . . [T]he thirty-three incidents [in the whole facility] involving weapons, only four of which occurred on the back hallway, are hardly sufficient to demonstrate that Holman was a prison "where violence and terror reign."

Harrison, 746 F.3d at 1299-00 (citation and footnotes omitted); see also id. at 1294 n.6. Whatever else we might observe about Harrison, Leeper's claims fall far short. Indeed, on this record, it cannot be said that the security procedures used by GEO employees were generally known to subject inmates to a strong likelihood of an excessive risk of violence. Again, on this record, the district court did not err in granting summary judgment in favor of GEO's employees.

Leeper also seeks to hold GEO itself liable for the unstated policy that Davis followed -- allowing guards to watch the horticulture classroom through glass windows when he left -- instead of requiring its employees to follow its State-approved policy of having the inmates watched at all times from within. But, regardless of the policy, Leeper's argument that uninterrupted in-person supervision is mandated is contrary to our case law. As we've said, the Eighth Amendment does not require the uninterrupted personal supervision of all inmates. See Purcell, 400 F.3d at 1323 n.23 ("The Constitution does not require that every inmate in a jail be observed by a guard every twenty minutes."); Hale v.

19

Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995) (evidence that jailer failed to check on group cell during hour between last check and beating was not sufficient to show deliberate indifference). Even where there is a known risk of serious harm -- like, for example, with an overtly suicidal inmate -- we still have not ineluctably required uninterrupted personal supervision. See, e.g., Sanders v. Howze, 177 F.3d 1245, 1248, 1251 (11th Cir. 1999) (rejecting deliberate indifference claim where inmate who had recently attempted suicide was left alone for at least four to six hours); Williams v. Lee County, 78 F.3d 491, 492-93 (11th Cir. 1996) (rejecting deliberate indifference claim where known suicidal inmates were left alone for 15 to 20 minutes).

Moreover, we cannot find any support in the record for Leeper's claim that uninterrupted supervision was required on the basis that the facility had mixed medium-security and close-custody inmates in the same classroom. First, Graceville was designed to house close-custody inmates; close-custody inmates were not interspersed in a medium-security facility. Second, courts have generally declined to impose liability where the complained-of danger resulted from mixing inmate custody classifications. See, e.g., Jones v. Diamond, 594 F.2d 997, 1015 (5th Cir. 1979) [2] ("The Constitution does not expressly require states to develop prisoner classification plans for the incarceration of convicted criminals."). And in

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.

any event, Leeper has not shown that GEO's practice of allowing mixed-custody classes in this penal institution resulted in wide-spread abuses such that prison officials must have known about the palpable danger of serious injury.

Finally, Leeper raises still other claims against Warden Henry and Assistant Warden Stewart. The law by now is clear that a supervisor may be held liable for the actions of his subordinates under §1983 if he personally participates in the act that causes the constitutional violation or where there is a causal connection between his actions and the constitutional violation that his subordinates commit. Braddy v. Fla. Dep't of Labor & Emp't Sec., 133 F.3d 797, 802 (11th Cir. 1998). A causal connection can be established if a supervisor had the ability to prevent or stop a known constitutional violation by exercising his supervisory authority and he failed to do so. Keating v. City of Miami, 598 F.3d 753, 765 (11th Cir. 2010); see also Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (supervisor may be liable upon a showing of "a history of widespread abuse [that] puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so" (quotation omitted)).

On this largely barren record, however, Leeper's supervisory liability claims against Warden Henry and Assistant Warden Stewart fail. First, as we've already observed, there was no Eighth Amendment constitutional violation on the part of their subordinates. Second, Leeper has offered no record evidence that Henry or

21

Stewart had personally participated in any way in the events surrounding the attack, or that they had any knowledge of prior attacks under remotely similar circumstances, or had any specific knowledge about the events involved in Owens's attack.

Nor does her claim that Stewart was negligent in his training of security staff fare any better. Notably, a supervisory official is not liable under § 1983 for failure to train unless: (1) his failure to train amounts to deliberate indifference of the rights of persons his subordinates come into contact with; and (2) the failure has actually caused the injury of which the plaintiff complains. See Keith v. DeKalb County, 749 F.3d 1034, 1052-53 (11th Cir. 2014). Thus, Leeper must demonstrate that Stewart had "actual or constructive notice that a particular omission in [GEO's] training program cause[d] [GEO] employees to violate citizens' constitutional rights" and, despite that notice, Stewart chose to retain the deficient training program. Id. at 1052 (quotation omitted). To establish that a supervisor had actual or constructive notice of the deficiency of training, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary." Id. at 1053 (quotation omitted).

Leeper has not made this showing. Even assuming Stewart's training program was deficient and even if that failure to adequately train or supervise did cause Owens' death, the record forecloses the conclusion that Stewart had actual or

22

constructive notice of the deficiency of the training.  There is no evidence that any inmate at Graceville had suffered any harm as a result of an instructor leaving a classroom; therefore, the single incident involving Owens can hardly be termed the result of "a pattern of similar constitutional violations." See id.  Absent any evidence that his subordinates were engaged in behavior that violated the inmates' Eighth Amendment right to be protected from violence at the hands of other inmates, Stewart had no constitutional obligation to train security guard Strickland or anyone else in some discernibly-different way.  Thus, on this record, Leeper cannot establish a constitutional violation grounded in the failure to train or supervise personnel to adequately handle the situation in which an instructor needed to leave the classroom.

## II.

Turning to the cross-appeal, we likewise are unpersuaded by the Defendants' challenge to the district court's order declining to retain supplemental jurisdiction over Leeper's Florida law wrongful death claim.  We review the district court's decision not to exercise supplemental jurisdiction over state law claims for abuse of discretion.  Myers v. Cent. Fla. Invs., Inc., 592 F.3d 1201, 1211 (11th Cir. 2010).  "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes

23

findings of fact that are clearly erroneous." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1096 (11th Cir. 2004) (quotation omitted).

The Supreme Court has instructed the federal courts deciding whether to exercise supplemental jurisdiction over a state law claim -- after all the federal claims in the case have been dismissed -- to consider these four factors: comity, convenience, fairness, and judicial economy. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966). The Court has explained that the Gibbs factors "usually will favor a decision to relinquish jurisdiction when 'state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought.'" Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988), superseded by statute on other grounds as recognized in Ameritox, Ltd. v. Millennium Labs., Inc., 803 F.3d 518, 531 & n.23 (11th Cir. 2015). This Court has repeatedly said that, when all of the federal claims have been dismissed pretrial, Supreme Court case law "strongly encourages or even requires dismissal of the state claims." L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984); Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) (noting that "we have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial"); Faucher v. Rodziewicz, 891 F.2d 864, 871-72 (11th Cir. 1990) (since Gibbs "strongly encourages or even requires

24

dismissal of the state claims . . . the district court properly dismissed [the plaintiff's] pendent claims as a result of its dismissal of all of her federal claims" (quotation omitted)); Shahawy v. Harrison, 778 F.2d 636, 644 (11th Cir. 1985) (observing that district courts are "strongly encourage[d]" if not "require[d]" to dismiss state law claims after all federal claims have been dismissed when a "state forum exists at the time of dismissal" (quotations omitted)).

Here, the district court initially decided to exercise supplemental jurisdiction over Leeper's state law claims when it granted summary judgment on the federal claim, but changed its mind less than two months later. Recognizing that dismissal of the state law claim would not raise a statute-of-limitations problem for Leeper if she had to re-file it in state court, the district court sua sponte declined to exercise supplemental jurisdiction and dismissed the state law claims without prejudice. It applied the Gibbs factors before doing so.

The Defendants claim, nevertheless, that the district court abused its discretion because the parties are now forced to re-litigate substantial and complicated issues the court has already decided over the three-year history of the case, including a finding of fraud on the court by a previous personal representative. But we are unconvinced that the district court abused its considerable discretion here. For starters, "[a]s a practical matter, the district court is in the best position to weigh . . . whether it is appropriate to exercise

25

supplemental jurisdiction." Lucero v. Trosch, 121 F.3d 591, 598 (11th Cir. 1997); Palmer v. Hosp. Auth. of Randolph Cty., 22 F.3d 1559, 1570 (11th Cir. 1994) ("Although we find that the district court had the power to exercise jurisdiction in this case, we believe that the discretionary aspects of the exercise of such jurisdiction are best left to the district court in the first instance."); see also Estate of Amergi ex. rel. Amergi v. Palestinian Auth., 611 F.3d 1350, 1365 (11th Cir. 2010) ("A district court does not abuse its discretion when it has a range of choices and the court's choice does not constitute a clear error of judgment . . . ." (quotation omitted)).

Applying the Gibbs factors to this case, comity decidedly weighs in favor of dismissal. As the district court observed, Supreme Court case law "strongly encourages or even requires dismissal of the state claims," where, as here, the federal issues were disposed of pre-trial and state issues substantially predominate. L.A. Draper & Son, 735 F.2d at 428. This rings especially true since one issue -- whether punitive damages are available to Leeper under Florida law -- appears to raise "a fairly close issue," and it would be better to have the issue resolved in state court. See Ameritox, 803 F.3d at 540 ("Federal courts are (and should be) loath to wade into uncharted waters of state law, and should only do so when absolutely necessary to the disposition of a case.").

As for the remaining Gibbs factors, Leeper relies on Parker v. Scrap Metal Processors, Inc., 468 F.3d 733 (11th Cir. 2006), a "peculiar" case in which this Court reversed the district court's refusal to exercise supplemental jurisdiction over state claims. Id. at 745. There, the parties had gone to trial, a jury had entered judgment in favor of plaintiff on all claims (federal and state), and this Court had remanded for a retrial as to damages on plaintiff's state tort claims. Only then, on remand, did the district court dismiss the state law claims, instead of trying the damages issue. Id. at 737-38. But this case is nothing like Parker. Neither claim has gone to trial and no judgment has been entered on the state claim. Rather, it is a run-of-the-mill case where the district court granted summary judgment on the federal claims. See, e.g., Eubanks v. Gerwen, 40 F.3d 1157, 1162 (11th Cir. 1994) (remanding case to district court and suggesting that the court should "carefully consider" whether to dismiss plaintiff's state law claims where the court had granted summary judgment on plaintiff's federal law claims); Faucher, 891 F.2d at 871-72 ("[T]he district court properly dismissed [the plaintiff's] pendent claims as a result of its dismissal [on summary judgment] of all of her federal claims."); Crosby v. Paulk, 187 F.3d 1339, 1352 (11th Cir. 1999) (remanding for the district judge to grant the defendants summary judgment based on qualified immunity and to determine whether the remaining state-law claims should be dismissed without prejudice).

27

Nor have the Defendants explained why they will need to expend substantial additional resources to reproduce their arguments in state court. See Ameritox, 803 F.3d at 539  ("Both parties are free to use evidence obtained during discovery to pursue their state-law claims in a proper forum."). In fact, we have squarely rejected the argument that "once a court has poured sufficient resources into a case, we should hesitate before writing off that investment." Id. at 538-39. As we explained, "[i]f we hold that considerations of judicial economy favor retaining jurisdiction, we would provide litigants with perverse incentives to sandbag their own cases in the hope that courts spend enough resources to make decisions to exercise supplemental jurisdiction effectively unreviewable." Id.

What's more, the district court expressly found that it would not be "unfair" for the parties to proceed in state court on the wrongful death claim. While the court recognized that the litigation had been pending for almost three years and that discovery had closed, it also observed that both parties had contributed to the delay by filing numerous motions to stay and extend deadlines throughout the course of the proceedings. We cannot fault the district court for these determinations concerning the nature and timing of this case, especially since the district court was required to reexamine its jurisdiction once it granted summary judgment on the federal claims. See id. at 532 ("Once any of these factors is satisfied, the district court possesses the discretion to dismiss supplemental claims

and must 'weigh . . . at every stage of the litigation,' whether to dismiss the supplemental claims."). In short, we simply cannot say that the district court abused its broad discretion by declining to exercise supplemental jurisdiction over the Florida wrongful death claim.

**AFFIRMED**.